NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NEUROGRAFIX, NEUROGRAPHY INSTITUTE MEDICAL ASSOCIATES, INC., IMAGE-BASED SURGICENTER CORPORATION, AARON GERSHON FILLER,**
*Plaintiffs-Appellants*

**v.**

**BRAINLAB, INC., BRAINLAB AG, BRAINLAB MEDIZINISCHE COMPUTERSYSTEME GMBH,**
*Defendants-Appellees*

---

2018-2363

---

Appeal from the United States District Court for the Northern District of Illinois in No. 1:12-cv-06075, Judge Matthew F. Kennelly.

---

Decided: October 7, 2019

---

AARON GERSHON FILLER, Tensor Law, P.C., Santa Monica, CA, argued for plaintiffs-appellants.

JAY CAMPBELL, Tucker Ellis LLP, Cleveland, OH, argued for defendants-appellees. Also represented by DAVID AARON BERNSTEIN.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

U.S. Patent No. 5,560,360, which names Dr. Aaron Filler as a co-inventor, describes and claims particular methods of generating images of nerves and other bodily structures by use of magnetic resonance imaging (MRI) technology. Dr. Filler and the three appellants named in the caption (collectively, NeuroGrafix) sued the appellees named in the caption (collectively, Brainlab), asserting infringement of the '360 patent. The case was consolidated with cases filed against other defendants and assigned for pretrial purposes to a multidistrict litigation (MDL) court. The MDL court granted summary judgment of non-infringement to Brainlab, and it denied reconsideration, as did the original district court when the case returned from the MDL court. NeuroGrafix appeals. We conclude that the grant of summary judgment was procedurally improper, and we resolve the parties' key disputes about claim construction. We reverse and remand.

## I

## A

The '360 patent describes methods and systems for creating detailed images of neural tissues by using diffusion tensor imaging (DTI), an application of MRI technology. '360 patent, Abstract; *see also id.*, col. 21, lines 35–45. DTI exploits certain facts about water diffusion in, *e.g.*, brain structures. Notably, diffusion along white matter nerve tracts is anisotropic: substances such as water diffuse freely along the main, long axis of the nerve tract, but diffusion is very limited in a direction perpendicular to (across) that axis. *Id.*, col. 5, lines 5–11. By contrast, the surrounding gray matter is relatively isotropic: substances

diffuse at similar rates in all directions. *Id.*, col. 5, lines 11–12.

In the patented method, pulsed magnetic field gradients are applied in two orthogonal (perpendicular) directions in a region containing the nerve tissues for which a precise image is sought. *Id.*, col. 5, lines 17–21; *see also id.*, col. 15, lines 40–57. "[I]f the axis of the nerve is generally known to the operator," the specification explains, "the direction of the desired orthogonal diffusional weighting gradients can be readily determined." *Id.*, col. 15, lines 58–62; *see also id.*, col. 16, lines 34–47. "On the other hand, if the axis of the peripheral nerve is not known, or if many[ ] nerves having different axes are being imaged," the initial directions for the magnetic field gradients are "arbitrarily selected," and then a number of alternative directions are used. *Id.*, col. 15, lines 63–67; *id.*, col. 16, lines 48–53.

The result of this process of applying magnetic field gradients depends on the types of tissue in the subject region. In isotropic tissue, the signal reduction will be the same regardless of how the magnetic field gradients are oriented relative to the tissue, whereas in anisotropic tissue, the signal reduction will be greatest when the magnetic field gradients are parallel and perpendicular, respectively, to the direction of the anisotropy, *i.e.*, along the major, long axis of the neural tract. *Id.*, col. 5, lines 21–39. Accordingly, neural tissue can be identified and visually differentiated from the surrounding structures by determining the areas of greater relative anisotropy. *Id.*, col. 6, lines 46–55; *see also id.*, col. 15, lines 52–57 ("[W]ith gradients approximately perpendicular and parallel to the axis of the peripheral nerve at the particular point being imaged, the parallel gradient image can be subtracted from the perpendicular gradient image to produce the desired 'nerve only' image.").

Claim 36 of the '360 patent is the only independent claim at issue in this appeal, and the parties have generally treated that claim as representative. That claim recites:

36. A method of utilizing magnetic resonance to determine the shape and position of a structure, said method including the steps of:

(a) exposing a region to a magnetic polarizing field including a predetermined arrangement of diffusion-weighted gradients, the region including a selected structure that exhibits diffusion anisotropy and other structures that do not exhibit diffusion anisotropy;

(b) exposing the region to an electromagnetic excitation field;

(c) for each of said diffusion-weighted gradients, sensing a resonant response of the region to the excitation field and the polarizing field including the diffusion-weighted gradient and producing an output indicative of the resonant response; and

(d) vector processing said outputs to generate data representative of anisotropic diffusion exhibited by said selected structure in the region, regardless of the alignment of said diffusion-weighted gradients with respect to the orientation of said selected structure; and

(e) processing said data representative of anisotropic diffusion to generate a data set describing the shape and position of said selected structure in the region, said data set distinguishing said selected structure from other structures in the region that do not exhibit diffusion anisotropy.

*Id.*, col. 42, line 43, through col. 43, line 2. The central dispute in this appeal involves the "selected structure" limitation in steps (a), (d), and (e).

B

In August 2012, NeuroGrafix, Neurography Institute Medical Associates, Inc., and Image-Based Surgicenter Corporation sued Brainlab, Inc., Brainlab AG, and Brainlab Medizinische Computersysteme GmbH in the Northern District of Illinois, and in August 2014, Dr. Filler became a co-plaintiff by the filing of an amended complaint. The plaintiffs (NeuroGrafix) alleged that users of Brainlab's FiberTracking software directly infringed the '360 patent and that Brainlab induced the direct infringement by those users through statements in its manual and advertisements directing users to use the software in an infringing manner.[1] In particular, NeuroGrafix asserted claims 36–37, 39–42, 44, 46–47, and 49, all of which are method claims. Brainlab counterclaimed for a declaratory judgment that the asserted claims of the '360 patent are invalid.

In April 2013, the Judicial Panel on Multidistrict Litigation transferred the case to the District of Massachusetts, where it was consolidated, for pretrial proceedings, with several cases that NeuroGrafix brought against various MRI equipment manufacturers and university and hospital end-users.

In May 2016, Brainlab filed the first of its two motions for summary judgment of non-infringement. Brianlab relied on customer-protection provisions of settlement agreements NeuroGrafix had entered into with MRI-equipment makers Siemens, GE, and Philips. Brainlab argued that

---

[1] There is evidence in the record before us that a user of the FiberTracking software selects a region of interest from an anatomical image fused with DTI data and chooses a minimum diffusion value and a minimum length, and the software then displays all fibers that intersect the chosen region of interest and exceed the minimum diffusion and length parameters.

its FiberTracking software is used to process the output from MRI systems made by those manufacturers and that FiberTracking users do not infringe under the terms of the settlement agreements. In its response, NeuroGrafix argued, among other things, that Brainlab could still be liable for infringement by "unauthorized independent medical practitioners" who use Brainlab's software but are not customers of Siemens, GE, or Philips.

The MDL court granted the motion, but only in part, in August 2016. It held that summary judgment of non-infringement was proper with respect to Brainlab's customers using Siemens MRI systems but not as to Brainlab's customers using GE and Philips MRI systems, reasoning that only the Siemens settlement agreement, not the GE or Philips agreements, extended to Brainlab's software. The court also held summary judgment of non-infringement proper as to the alleged independent medical practitioners, concluding that NeuroGrafix had produced "no evidence that any of the handful of such practitioners identified by [NeuroGrafix] used Brainlab products in their alleged infringement." J.A. 51.

Brainlab eventually filed a second motion for summary judgment, but before that occurred, NeuroGrafix, in September 2017, sought leave to file a second amended complaint that, if allowed, would add allegations that Brainlab itself directly infringed the '360 patent because the steps performed by Brainlab's customers were attributable to Brainlab under an agency theory. In conjunction with its proposed second amended complaint, NeuroGrafix filed a declaration from Dr. Filler and attached several articles and other exhibits allegedly demonstrating infringement by several of Brainlab's customers, such as Memorial Sloan Kettering Cancer Center and Akron General Hospital. The MDL court denied NeuroGrafix permission to file a second amended complaint, characterizing the new allegations as a "last-ditch attempt to repackage the inducement claim," which it had "long alleged but neglected until the close of

fact discovery," as a direct-infringement claim under an agency theory.  J.A. 6986.

In February 2018, Brainlab filed its second motion for summary judgment of non-infringement.  Brainlab's entire argument was that users of the software do not commit direct infringement and therefore Brainlab could not be liable for induced infringement; it made no argument against inducement liability except for the absence of direct infringement.  J.A. 7309 ("without direct infringement there can be no induced infringement"), 7327 ("Absent direct infringement, there can be no induced infringement.").  On direct infringement, Brainlab argued that users of the FiberTracking software do not satisfy two limitations of claim 36—the "selected structure" limitation and the "do not exhibit the diffusion anisotropy" limitation.  In support of that assertion, Brainlab set forth essentially three arguments in its motion.

First, and most significantly for present purposes, Brainlab argued that "selected structure" requires that a user know the "existence and location" of the structure of interest before performing the claimed steps of exposing a region to a magnetic field, sensing a resonant response, and so forth.  J.A. 7308.  Brainlab asserted that it was impossible for users of the FiberTracking software to "select[] [a] structure" because "Brainlab's FiberTracking module does not permit a user to isolate or select a specific structure for tractography" before scanning; instead, the accused software "automatically generates all tracts that intersect a certain volume, like a tumor, if they meet certain criteria," and those tracts "are not visible until after the FiberTracking software has been run."  J.A. 7322; *see* J.A. 7308 ("users of Brainlab's FiberTracking module cannot infringe claim 36" because they cannot select a structure as required), 7309 (same), 7312 (same), 7322 (same), 7324 (same), 7325 (same), 7327 (same).  Second, Brainlab contended that "selected structure" was limited to peripheral nerves, whereas the FiberTracking software was used to image only nerves

in the brain, which are not considered peripheral nerves. J.A. 7317–18. Third, Brainlab argued that "do not exhibit diffusion anisotropy" should be construed as requiring zero diffusion anisotropy. J.A. 7321. Under that construction, Brainlab asserted, the limitation was not satisfied because the gray matter distinguished by the FiberTracking software has a small but nonzero anisotropy, J.A. 7325–27, and the FiberTracking software does not permit users to choose zero as the anisotropy threshold above which structures will be displayed, J.A. 7322.

In its opposition, NeuroGrafix responded to Brainlab's arguments. It argued that "selected structure" does not require that the precise location and orientation of the chosen structure be known in advance. J.A. 8011–12. According to NeuroGrafix, users *could* satisfy the claim by, for instance, obtaining a preliminary MRI image, choosing a structure that would be "distinctive and visibly apparent" from the preliminary image (such as the pyramidal tract), and then performing the steps of the claimed method with the chosen structure as the subject. J.A. 8012; *see* J.A. 8011–13, 8025–26. NeuroGrafix also asserted that the FiberTracking software was capable of being used in such a manner, pointing to Brainlab's advertisements, which state that users can use the software to image the pyramidal tract, J.A. 8013, 8015, and the FiberTracking manual, which instructs that users can select fiber bundles to include or exclude in the region of interest, J.A. 8020.

The MDL court granted Brainlab's second summary-judgment motion in May 2018. *In re NeuroGrafix ('360) Patent Litig.*, MDL No. 13-2432, 2018 WL 2392000, at *5 (D. Mass. May 25, 2018) (*Summary Judgment Op.*). It rejected Brainlab's claim-construction arguments limiting "selected structure" to peripheral nerves and limiting "do not exhibit diffusion anisotropy" to zero anisotropy. *See id.* at *3. As to Brainlab's argument that some aspects of the "selected structure" must be known in advance, the court rejected Brainlab's position that it was not possible to use

the FiberTracking software in a manner that satisfies the claim limitation. *See id.* "[D]epending on the physician's purpose and objective," the court held, "FiberTracking is capable of both infringing uses and non-infringing uses," though it did not identify precisely what those infringing and non-infringing uses would be. *Id.*

Nevertheless, the court concluded, summary judgment was warranted because NeuroGrafix had pointed to no evidence that any FiberTracking users actually used the software in an infringing manner, *i.e.*, there was "nothing in the record showing that either Brainlab or any of its customers actually uses FiberTracking in the manner hypothesized by Neuro[G]rafix." *Id.* at *4; *see also id.* at *4 n.5 (concluding that there was "no evidence in the record" that neurosurgeons used FiberTracking to "ascertain the precise location of the pyramidal tract" to avoid injuring it during surgery). The court also determined that instances of direct infringement could not be inferred from statements in Brainlab's advertisements that it was "possible" to use the FiberTracking software to delineate the pyramidal tract, noting that those materials "do[] not teach a means of selecting a particular ROI and FA Threshold and Minimum Length values to accomplish this, nor does it recommend this as a superior or even commensurate mode of use." *Id.* at *4. In a footnote, the court added a conclusion seemingly about the absence of inducement even apart from the absence of direct infringement, even though Brainlab's motion had not so argued. It stated that, as a matter of law, Brainlab did not induce infringement "for the same reason that a reasonable factfinder cannot infer instances of direct infringement," namely, the FiberTracking advertisements and manual "[do not] teach an infringing use of the device *such that* we are willing to infer from those instructions an affirmative intent to infringe the patent." *Id.* at *4 n.6 (quoting *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015)).

In June 2018, NeuroGrafix moved for reconsideration of the MDL court's grant of summary judgment, primarily arguing that several articles attached to NeuroGrafix's motion for leave to file a second amended complaint had provided evidence of actual infringing uses of the FiberTracking software. The MDL court denied NeuroGrafix's motion for reconsideration, noting that NeuroGrafix had not included or relied on the relevant articles in its opposition to Brainlab's summary-judgment motion.

The case was then remanded to the Northern District of Illinois for proceedings on Brainlab's invalidity counterclaim. **[A191]** In July 2018, NeuroGrafix asked the Illinois court to reconsider the MDL court's summary-judgment order, contending, as relevant here, that the MDL court had granted summary judgment on a basis not asserted in Brainlab's summary-judgment motion. J.A. 8775–76, 8781–83. The district court denied NeuroGrafix's motion for reconsideration and dismissed Brainlab's invalidity counterclaim without prejudice, producing a final judgment.

NeuroGrafix appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II

### A

We begin by addressing NeuroGrafix's procedural challenge to the MDL court's grant of summary judgment. NeuroGrafix argues that it was improper for the MDL court to fault it for failing to produce evidence of actual infringement because Brainlab argued only that, under its construction of "selected structure," the accused software was not capable of infringement, not that, under the construction adopted by the MDL court, there was no evidence of actual infringement. We review the MDL court's grant of summary judgment de novo. *Momenta Pharm., Inc. v. Teva Pharm. USA Inc.*, 809 F.3d 610, 614 (Fed. Cir. 2015)

(following First Circuit law); *see also In re Cygnus Telecomms. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1352 (Fed. Cir. 2008) (following law of MDL court's regional circuit in deciding issues involving summary-judgment procedures). We agree with NeuroGrafix and accordingly reverse the grant of summary judgment.

As Brainlab's motion for summary judgment repeatedly made clear, its non-infringement position depended on the premise that "select[ing] [a] structure" requires knowing in advance the location of the chosen structure. Under that construction, Brainlab argued, the FiberTracking software is not capable of infringement, since the software is used to detect structures whose location is not already known. *See, e.g.*, J.A. 7311 ("Claim 36 is focused on determining the location and shape of an anisotropic structure that is already known and 'selected' for imaging in advance of scanning . . . . Conversely, Brainlab's Fiber[T]racking module is focused on *finding* patient specific anisotropic structures that are *not* previously known."); J.A. 7322 ("The user certainly cannot select a structure in advance of scanning. The reason is simple: Brainlab's FiberTracking module is used to find white matter tracts that are not visible until after the FiberTracking software has been run . . . .").

Moreover, the expert reports cited in Brainlab's summary-judgment motion were also premised on this understanding of "selected structure." Dr. James Leach declared that "the neuroradiologist cannot select certain white matter structures or tracts in advance for imaging" because "the position or orientation of white matter tracts is not known in advance of imaging" in cranial DTI. J.A. 7921. Dr. Andrew Tsung stated that "I do not select certain white matter structures for imaging by the MRI," as "[t]he location of white matter tracts are not identifiable prior to imaging." J.A. 7912. And Dr. Michael Moseley asserted that "a 'selected' structure is one where the axis of the structure, such as a nerve, . . . would be known in advance of the

imaging," J.A. 7946, and using that understanding, he added that "there is no 'selected structure' when DTI imaging is performed" using Brainlab's FiberTracking software because "the axes of the white matter fiber tracts are not known in advance," J.A. 7947. Neither Brainlab nor its experts argued in the alternative that, even if "selected structure" did not include a requirement of knowing the position, orientation, location, or axes of a structure in advance, the record was devoid of evidence that Brainlab's customers used the FiberTracking software to image particular chosen structures.

In its summary-judgment opposition, NeuroGrafix disputed this claim construction, essentially arguing that "selected structure" simply requires choosing a particular structure as a subject for the claimed process. That is possible in the FiberTracking software, NeuroGrafix asserted, because at least the pyramidal tract is visible after taking a preliminary image and can then be chosen for imaging according to the claimed method. *See* J.A. 8012 ("[E]ither visually after opening the skull or from preliminary routine MRI scout images, the technologist can select[] a brain structure called the pyramidal tract."); J.A. 8014–15 ("With tractography and DTI, it is possible to select this structure of the brain . . . and then to provide this selected structure as an ROI for the FiberTracking software."). And Neuro-Grafix pointed to Brainlab's advertisements as evidence that such a use was possible and even encouraged by Brainlab. *See* J.A. 8015 (showing Brainlab advertisement that says: "It is possible to delineate major white matter tracts, such as the pyramidal tract, by applying fiber tracking algorithms."); *see also* J.A. 8013 (showing Brainlab advertisement that says: "Waves of DTI data on exotic eloquent white matter specimens, like pyramidal tracts, now flow easily to your BrainLAB IGS."). In other words, NeuroGrafix argued, and the MDL court eventually agreed, that the FiberTracking software is capable of infringing uses as well as non-infringing uses.

That showing was sufficient for NeuroGrafix to defeat summary judgment, and the MDL court erred in concluding otherwise. NeuroGrafix demonstrated that there was a genuine dispute of material fact on the only issue raised by Brainlab, namely, whether the FiberTracking software was capable of infringing uses. Evidence of actual infringing uses of the FiberTracking software was unnecessary to answer the only grounds for summary judgment asserted by Brainlab.[2]

A court cannot grant summary judgment on a ground that was neither asserted by the movant nor made the subject of judicial action under Rule 56(f) that gave the non-movant proper notice of the ground and of the obligation "to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *see Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed. Cir. 1995) (following Seventh Circuit law); *see also*, *e.g.*, *Lusson v. Carter*, 704 F.2d 646, 647 (1st Cir. 1983). And in the specific context of patent infringement, we have held that summary judgment of non-infringement requires the accused infringer to "point[] to the specific ways in which accused systems did not meet the claim limitations." *Exigent Technology, Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006). The MDL court's ruling was contrary to those basic principles in that it granted summary judgment against NeuroGrafix for its failure to come forward with evidence to answer a non-

---

[2] Thus, we need not and do not decide whether, even if NeuroGrafix did not produce direct evidence of actual infringement, instances of infringement can be inferred from the statements and figures in Brainlab's advertisements and manual. *See Summary Judgment Op.* at *4 (citing *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010)).

infringement ground that had not been asserted and of which it had not been given proper notice.

To be sure, our law is clear that, in this case, Neuro-Grafix could not sustain a claim of direct infringement of the method claims by merely showing that the accused software is "capable of" operating in an infringing manner. *See, e.g.*, *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). We assume, without questioning, that in this case NeuroGrafix must ultimately make a showing that the accused software was *actually* used in an infringing manner by Brainlab (for direct infringement case) or by one or more of Brainlab's customers (for indirect infringement). Moreover, it is understandable that the district court might be surprised that NeuroGrafix made no such showing after the years of litigation and discovery this MDL spanned. Nevertheless, the motion being considered by the district court in this case was one structured and limited by the movant. The court was not free to look down the road and consider what the non-movant might need to establish to survive a differently structured, well-supported motion. The motion before it necessarily limited the court's inquiry.

For the same reason, the MDL court's apparent holding that Brainlab's advertisements and manual do not induce infringement as a matter of law also was procedurally improper. *See Summary Judgment Op.* at *4 n.6. Brainlab's summary-judgment motion argued only that "Brainlab cannot induce infringement of the asserted claims of the '360 patent" because "[a]bsent direct infringement, there can be no induced infringement." J.A. 7327. It did not argue, as the MDL court seemed to conclude, that the relevant Brainlab materials merely suggested that an infringing use was possible rather than instructing how to use the software in an infringing manner. To the extent that this conclusion was an independent basis for the MDL

court's grant of summary judgment, we reverse the court's decision on that ground as well.[3]

B

The MDL court's procedural error is an adequate ground for reversal and does not depend on whether its claim construction of "selected structure" was correct. But we address the disputes about the proper construction of that term so that the district court can apply the correct construction on remand. We review the MDL court's claim construction de novo and any underlying factual findings based on extrinsic evidence for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

We conclude that to "select[] [a] structure" is simply to choose it as a subject for placement into the claimed process that starts with exposing a region to a magnetic field, proceeds to sensing a resonant response, and continues as claimed. That meaning follows from the language of claim 36 itself: in step (a), the region exposed to a magnetic polarizing field includes the "selected structure," and in step (e), the resulting data set distinguishes the "selected structure" from other structures in the region. '360 patent, col. 42, lines 46–50; *id.*, col. 42, line 64, through col. 43, line 2. The specification does not use the language of "selected structure," but it uses "select" simply to describe choosing something before taking some action. *See, e.g.*, *id.*, col. 14, lines 53–62 (discussing "select[ing]" a region of interest before determining the average intensity within that region of interest); *id.*, col. 28, lines 23–26 (discussing "select[ing] a volume of interest" before rendering that volume of interest into a projection neurogram).

---

[3]    The MDL court's rejection of NeuroGrafix's inducement claim may also have been based on a construction of "selected structure" that, as we discuss below, was incorrect.

The MDL court did not set forth a precise claim construction of "selected structure" in its summary-judgment opinion.[4] In one key respect, though, the court's understanding of the phrase fits the simple construction that we think is mandated. The court correctly rejected the construction that seemingly underlies Brainlab's contention that infringing use of the FiberTracking software is impossible, namely, that a "selected structure" is one whose location, orientation, axis, or the like is known in advance of the claimed mapping process to the same degree it will become known upon completion of that process. And the court indicated that "delineat[ing] the pyramidal tract," *Summary Judgment Op.* at *4, and "ascertain[ing] the precise location of the pyramidal tract," *id.* at *4 n.5, would satisfy the "selected structure" limitation. Those observations fit the specification's express contemplation of performing the patented method even when, for example, "the axis of the peripheral nerve is not known." *Id.*, col. 15, lines 63–64.

Two further points about claim construction contentions advanced by the parties—one by Brianlab, one by NeuroGrafix—are warranted. Brainlab has suggested that software that tracks all fibers in an area cannot perform the method, because the tracking is not limited to a particular selected structure. That view is not supported by claim 36's language. As long as a chosen structure is among those put into the process for distinguishing the data or images in the way the claim specifies, the claim is satisfied, even if the process used to do that results in comparable data and images for other structures as well. Both

---

[4] The MDL court did not construe "selected structure" in its August 2016 claim-construction order; nor did the parties agree to a construction of the phrase. *See In re NeuroGrafix ('360) Patent Litig.*, 201 F. Supp. 3d 206, 212 & n.4 (D. Mass. 2016).

claim 36's preamble and the claim phrase "region including a selected structure" use the word "including." '360 patent, col. 42, lines 45, 48. We have "consistently interpreted 'including' and 'comprising' to have the same meaning, namely, that the listed elements . . . are essential but other elements may be added." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008). And nothing in the language following either of the "including" terms implies that no other structure may be mapped in the claimed way when a particular chosen structure is placed into the claimed mapping process.

For its part, NeuroGrafix argues on appeal that "selected structure" should be construed as equivalent to "region" and that all uses of the FiberTracking software are therefore infringing because Brainlab's customers necessarily choose a region to be the subject of the claimed method before performing the steps of the method. That always-infringes contention is the polar opposite of Brainlab's never-infringes contention, and it is equally wrong. The argument was likely forfeited by not being adequately presented; indeed, in its motion for reconsideration before the MDL court, NeuroGrafix specifically agreed with the MDL court's conclusion that "FiberTracking is capable of both infringing uses and non-infringing uses." J.A. 8449 (quoting *Summary Judgment Op.* at *3). In any event, NeuroGrafix's construction contradicts the claim language. Claim 36 refers to "selected structure" and "region" as separate concepts, with "selected structure" being something merely located in the "region." *See* '360 patent, col. 42, lines 48–50 ("the region including a selected structure that exhibits diffusion anisotropy and other structures that do not exhibit diffusion anisotropy").

## III

For the foregoing reasons, we reverse the MDL court's grant of summary judgment and remand for further proceedings consistent with this opinion.

Each party shall bear its own costs.

**REVERSED AND REMANDED**